Our fifth argument of the morning comes in Appeal No. 24-1564, Bernard Mims v. City of Chicago. Ms. Blagg? Blagg. Blagg. Nice to see you. It's not as sophisticated as Blagg. May it please the Court, I'm Jennifer Blagg. I'm here today representing Bernard Mims. An issue in this case is a very simple case. It's whether or not the defendant's city officers violated Brady. The key centerpiece of this is recordings. Recordings that were taped or obtained pursuant to a confidential or consensual overhear. The parties don't dispute that in this case five recordings were obtained from confidential overhear 13. The issue is who was responsible for suppressing three of the five tapes. Now Judge Seeger found that Mims did not meet the burden of summary judgment in finding that the prosecutors were the responsible party. But the parties don't contest that right now Judge Seeger got it wrong. Judge Seeger said that there were pages missing from A.S.A. Delaney's deposition for him to review and those pages were the pages that established that the state's file had two tapes and two tapes were given to the defense. So how these recordings work and just a briefly overview. When you have a consensual overhear, the affine has to attest to a judge that he heard a confession. That approval, the wire is approved, then they wear the wire, tapes are recorded, those tapes are impounded. So what happened here is how did it come to pass that the prosecutor only had two tapes in his file? We believe the record supports a reasonable inference that the Chicago Police were responsible for suppression of the three tapes. The record supports a reasonable inference that the prosecutor relied on the Chicago Police Department to give him all the evidence in this case. And that's what typically happens in a criminal case. The prosecutor requests the evidence from the police, the police turn it over. The prosecutor testified that he met with the lead detective in this case, that's when he first learned about the overhears, that's how he obtained information about the overhears and that was long before Mr. Mims was ever charged. Did the prosecution also have the obligation to keep copies? The order from the COH says that the prosecutor should keep a copy. But Mr. Delaney addressed this in his deposition where he said the prosecutors didn't have a central repository where they kept COHs. So he did not have a place to immediately go find the COH and he was not on the original COH. So Delaney testified, it's my typical practice if I'm on the COH, I keep a copy of it. But he was not on the COH. He was the chief, right? Pardon? The chief. That's right. I think Tom Beastie, I'm not sure that's from Comrie. So what we do know is Delaney said it was his practice if he was on the COH, he would have kept a copy in the investigative file. The record shows that the investigative file in this case only contained two tapes. So the question becomes where, is that me? Where did those two tapes, where did Delaney get those two tapes? So when Detective Prespiora was asked, did you give Delaney copies of the COHs? He says, I don't recall. So if you take the evidence in the light most favorable to Mr. Mims, the reasonable inferences show that the prosecutor did not have access to the COHs in his file. The prosecutor met with Prespiora and learned about the COHs. The prosecutor said that he got the evidence from the COHs from Prespiora. Prespiora didn't deny that he gave the prosecutor copies of the COHs. And Delaney said he didn't keep a copy of the file. He wasn't involved to keep a copy of it. Did the clerk of the court have all five? Yes. And so that's really important to look at. That's another place that shows that Delaney, supports reasonable inference that Delaney got the copies from Prespiora. Because there were three COHs involved, COH 3, 7, and 13, I think. COH 13 was turned over to the defense attorney pursuant to the statute because it contained information relevant to this case. COH 3 and 7 were later requested by the defense attorney. So when Delaney went to the judge, Delaney said, judge, I was not able to obtain copies of these COHs. I need a court order to check those out. The record shows he never obtained a court order to check out COH 13. So he had to get copies from somewhere else. And he mentions it to the judge, I got copies of those other COHs. So it supports a reasonable inference, again, based on looking at the totality of the facts, that he got that from the Chicago police. What's odd about this is I understand why Mr. Simms, or Mr. Minns, is very focused on the COHs. I understand that. But all along, this information is in the court file. No. It's not in the court file. It is impounded with the clerk of the court, which is very different. So even in this case, for us to get access to COH 13, we had to have a court order to have it checked out. So it's not in the court file. Okay, but wouldn't, is it Bill Delaney, the ASA, wouldn't Delaney have known about that status, that whatever the overhear recordings are, if that's the way to say it, that the totality of them are going to be impounded with the court? Well, the question then becomes, was Delaney reasonable to rely on the Chicago Police Department to give him copies of the COHs? The Chicago Police Department gave him copies of everything else related to the COHs. No, but given that if there's something that's impounded, I know I'm not going to be as precise as you just were. Impounded with the, what did you say, impounded with the clerk of court?  Okay. If that which is not disclosed is impounded with the clerk of court, and the prosecutor is aware of that, and the, right? Yes. Doesn't, and it's the prosecutor that is shouldering the immediate disclosure obligation. Yeah, well, the prosecutor shoulders the immediate disclosure obligation of the entire investigative file. Where does he get that from? The Chicago Police. So, if you... But it's all available in an alternative source here. Of course, but our, I guess if you take that logic to its extension, is it incumbent on the prosecutor to actually go to police headquarters and review all the police reports to make sure that the police gave him a complete file, or can the prosecutor rely on the police to give them the evidence? And I submit that the prosecutor continuously relies on the police to give him a complete file. So, was it reasonable for Bill Delaney to ask Pres Biora for the copies of the COHS? Now, we have undisputed proof that the police have copies. It's an odd theory of suppression if everybody that works in CPD, works in Cook County Prosecutor's Office, is aware of how this all works with impoundment, right? It's an odd theory of suppression that Detective McNally would have withheld this knowing that what he is withholding is in the Cook County impoundment file. I don't think it's that odd given the fact that no one uncovered it until we uncovered it in 2021. It's routine for, there's nothing in the statute that says the prosecutor shall obtain the recordings from impoundment. The pattern of practice in this case, it's clear when you read the depositions, was for the Chicago Police Department to keep a copy of the recordings, to transcribe the recordings, and then, in turn, provide those to the prosecutor in the case. I submit it cannot be the prosecutor's burden that they have to check up on the Chicago Police in every aspect of the case. Even if there's another place that the prosecutor could look, there's always another place that the prosecutor could look to check to see if the police were complying. Like I said, they could have to go, I've only gone and inspected the investigative file in one case at the Chicago Police Department, but taking this court's reasoning to its logical extension, it would require the prosecutor to go do that, to go look at the original location for every source of Brady evidence. That's not what, nobody's got the time for that. They were relying on the police and working with the police to give them a complete copy of the COH. When he makes the comment, Delaney, in May of 2005, he says, I have to go to the impound to get the remaining copies. That's right. From, because I couldn't get it from the detectives. Yes. And so, if the court, defense counsel, as well as the prosecution is now aware before that there are tapes that are missing. No, no, they weren't aware of that. They were aware of tapes that were missing for other COHs. So, this one COH, COH 13, is directly probative on this case. You have someone admitting to confessing previously to this crime. The other COHs were ancillary. They didn't contain probative information, supposedly, about this case. So, in May of 2005, he's only asking maybe for 07 or 03. That's exactly the truth. Okay. The prosecutor is not aware that there were five recordings of 13. That's right. He was relying on the police. Police gave him two. And two are in his file. So, that matches. There are two in the prosecutor's investigative file and two in the defense attorney's file. So, I don't think there's any question three tapes didn't get turned over. And I believe this court, it would be a seminal holding, I think, to say that the prosecutor could not rely on the Chicago police to give him complete recordings. Counsel, I see you're running a little low on time. I am. Can you touch on materiality? Sure. Counsel, if I'm not mistaken, knew and had reports that Sarden had confessed. And part of the reason that the verdict was overturned here was because Counsel wasn't following up on those things. Well, that's the Cook County State's Attorney's purported basis for why. Okay. And it also, part of their basis was he couldn't have done it because he was physically unable. Yeah. Right? There were additional reasons.  There were other reasons. How do I grapple with the fact that you're asking for tapes that you arguably had a basis already to know what they said? So, then you have to listen to the tapes that he did receive to understand the difference in the value of the two tapes. On the tapes he did receive, you hear Michael Sarden repeatedly denying he ever confessed. Man, I didn't have anything to do with that. And he's saying on BD. It's not on video. He's saying on BD, which means like on my mother, on black disciples, what that means. On BD, I didn't say I did that. On BD, blah, blah, blah, blah. On the suppressed tapes, he admits to previously confessing at the basketball course. And not only that, he knows key facts about the case. He knows what kind of weapon was used. He names two other people that did the crime with him and the eyewitnesses said three people did the crime. He knew how the car got disposed of and he knew how the weapon got disposed of. It's really different. Why would someone go to the trouble of suppressing these three tapes and cheating if they had no value? Okay. We're going to give you some rebuttal time. Okay. Thank you. Okay. You're quite welcome. Is it Mr. Merrill? Yeah. Mr. Merrill. May it please the court. NIMS contends that two city detectives intentionally suppressed a recording in violation of Brady, but their claim fails for numerous independent reasons. One, there's no evidence that detectives ever possessed the recording. Two, the chain of causation is broken because the prosecution already had independent access to the recording separate from whatever police could have theoretically provided. And three, NIMS criminal defense counsel could have obtained the recording through reasonable diligence and accessed the impounded copy of the recording just like NIMS counsel did in the civil case. For any number one of these independent reasons, as well as the additional arguments in our brief, the district court's grand summary judgment should be affirmed. To start with the most striking deficiency in NIMS' case, while there is no evidence that the detectives ever had possession of the Richardson-Sardin recording, it is undisputed that the court had the original copy and the prosecution was required by law to possess a copy of the recording too. So not only could the detectives not have concealed a recording they never possessed, but regardless of whether they possessed the copy, the chain of causation linking the detectives to the nondisclosure is broken. Stepping back for a minute, it's important to emphasize that these confidential overhear applications are made by the state's attorney's office, and when recordings are ultimately made and impounded, it is the state's attorney's office, not the police department, that is ordered to retain copies, which under Illinois law they may not destroy. Even Delaney, the prosecutor in NIMS' case, testified that it was both his personal practice and the practice within the Cook County state's attorney's office to maintain copies of the recordings obtained from these confidential overhears in their own investigative files, and he personally knew that the original recordings were impounded at the court. Given that context, even if the police had a copy of the recording, which they did not, liability under Brady would still not attach. Loyalty is an obligation imposed on prosecutors. Police are only liable when they prevent the prosecutors from complying with their Brady obligations. Here, as the district court correctly explained, the detectives did not have an obligation under Brady to ensure that court-impounded materials to which the prosecution had access actually made it into the hands of defense counsel. And at a minimum, the defense are entitled to qualified immunity on that causation point because there is no clearly established law to the contrary. So NIMS claims fails for lack of causation. Moreover, there is no evidence that the detectives in this case even possessed a copy of this particular recording. The detectives testified that they did not have copies, and the prosecutor testified that he was not aware of any copy of the recording held by the police. Detective McNally, though, did testify that he listened to all of them. Yeah, because he was the one involved in the underlying confidential overhear, not on the later prosecution. And so he said immediately after they reported, he listened to them before they were retained by the state's attorney's office. And he submitted the affidavit, right, for the application? For the underlying confidential overhear. So is the idea that before the originals were submitted for impoundment filing or whatever the right way to say that is, that he just listened to the originals? Yeah, I think he was involved with the actual exercise of Richardson going out to get this recording. And so he listened to it either contemporaneously or immediately after and then never listened to it again after it was submitted. But he had copies of a couple of them. Well, there's no evidence that he even had copies of those two. If you actually look at what the prosecutor Delaney testified, he said he does not recall where he got these two recordings from. And McNally actually testified in his deposition that he, after that initial listening when they were first recorded, he never had them again. They were kept by the state's attorney's office. Indeed, to this day, no copy of the recording has ever been found or otherwise shown to have existed in police custody. Even the copy of the recording that we now have in evidence in the civil case today came from the court's impounded tapes, not from the police. Can I ask you another factual question? I meant to ask Ms. Blagg this, and maybe she can, we'll give her time to, if she wants to offer a thought on it. So much of the focus seems to be on the defendant, Daniel McNally, Detective McNally, and much less focus, at least to my eye, on the other defendant, Pris, I don't know how, Pris Pioria? Yes. Okay. I'm glad you said it out loud first. I don't know. Okay. He's not featured very much in this. What role did he play, if any? So my understanding, based on the record, was he wasn't involved in the underlying investigation. I believe he was part of the cold case unit. No, he was the lead detective for the trial. McNally was involved in the underlying confidential overhear when they took it. Years later, when Wims was eventually prosecuted, the other detective was the one who was kind of the liaison, let's call it, for the police department. Yeah, but that's well after these events. Yeah, years later, and he wasn't involved in the underlying confidential overhear. In fact, in his deposition, he said he didn't even know there was any information gleaned from confidential overhears, so it just wasn't even on his radar that this existed. Okay, but I mean, he's a remaining defendant, though, right? Yes, he's one of the two detectives still remaining. Wims' only supposed circumstantial evidence, to the contrary, that the detectives even had a copy of any of these recordings, is that his testimony explained that the police aren't legally allowed to keep copies, and in some case, they do, in fact, make their own copies. But whether police sometimes keep copies of recordings is not circumstantial evidence that specific detectives copied this particular recording. By way of analogy, the fact that it frequently rains in Chicago is not circumstantial evidence that it did, in fact, rain on any one day in the past. That's not how circumstantial evidence works. Nor does such testimony create a dispute of fact for purposes of summary judgment, because both things can be true. Detectives may sometimes keep recordings of confidential overhears, but these detectives did not have a copy of this recording from this confidential overhear, so both can be true and there is no dispute of fact. And the last point I would make is on reasonable diligence. A Brady claim requires that the evidence in question was not otherwise available to the defense counsel through reasonable diligence. Evidence cannot be suppressed, for example, if it could be subpoenaed by the defense counsel or, you know, through other investigative means. Here, the existence of the confidential overhear was known to defense counsel. Defense counsel knew that the original tapes were impounded at the court, and the court had ordered that defense counsel should have full access to all impounded records. Indeed, we know that defense counsel could have accessed the recording from the court, because Mims' counsel in this civil case did obtain the recording from the court. To be clear, we only know about the recording because of the impounded tapes that Mims' civil counsel, through their diligence, requested, not anything ever secured from police custody. So simply put, the Richardson-Sardin recording was always available to Mims' during his criminal case. His counsel just simply needed to take one more step to obtain it. Now, the city's briefing offered other additional arguments, independent of why Mims' claim fails, but if your honors don't have questions on those other bases, the city is prepared to rest on its briefing. Okay. Very well, Mr. Merrill. Ms. Black, yeah, I'll give you a couple minutes on rebuttal. Great. So we have testimony from Montgomery and Delaney that the Chicago police kept copies of the COHs. Now, we could be cute with language. Maybe the detectives didn't keep a copy in their file. Maybe it was the gang unit that kept a copy in their file, which is where Montgomery worked, where they transcribed the tapes, and the detectives would just have to ask for it. Presbyora had a lead role in this, and if our briefing minimizes his role, it's certainly not the intent in this. Presbyora provided a timeline to Bill Delaney that had these COHs on it. This operation was Operation Pickup. Operation Pickup had been going for years. It didn't pick up in 2003. It started in 2001 and continued throughout this time, and they were investigating various murders during that time. What happened was, in 2001, to Sondra McKee identified Mims, possibly from just looking at a single photo, and no one did anything for two years. That's unquestionable in this case.  Because the evidence against Mims was so thin, which goes to our Brady requirement. Mims didn't match the composite sketch. He didn't have a beard. He was injured. The state's attorney's office cited that as a reason, and this Brady violation would allow Mims to highlight the woeful inadequacy of the Chicago Police Department's investigation in this case. Sarden was never interviewed. Dwayne Chester was never interviewed. The police took no investigative steps on that. They didn't document in the reports any of these various investigative steps, and I believe it supports an argument that the police sought to frame Bernard Mims because Michael Sarden was valuable to the police because he was being used as an informant on other cases. Oh, one more point, just briefly. Defense counsel, they made the point defense counsel had a duty to ask for this. Defense counsel has to be able to rely on the prosecutors to give them evidence. He asked for this evidence specifically. He was given it to him. We asked for it because we had the advantage of timelines and evidence that weren't disclosed to the defense that gave us a just belief that there was something being hidden. Okay. Ms. Blank, thank you. Mr. Merrill, thanks to you and your colleague. We'll take the appeal under advisement.